*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2000 FED App. 0078P (6th Cir.)
File Name: 00a0078p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

FREDERICK WUEBKER and
RUTH WUEBKER,
    *Petitioners-Appellees,*

    *v.*

COMMISSIONER OF INTERNAL
REVENUE,
    *Respondent-Appellant.*

No. 98-2287



On Appeal from the United States Tax Court.
No. 11472-96

Argued: December 10, 1999

Decided and Filed: March 3, 2000

Before: JONES, COLE, and GILMAN, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Robert W. Metzler, U.S. DEPARTMENT OF
JUSTICE, APPELLATE SECTION TAX DIVISION,
Washington, D.C., for Appellant. John Anthony Logan,
Russell N. Cunningham, WRIGHT & LOGAN, Dublin, Ohio,
for Appellees. **ON BRIEF:** Robert W. Metzler, Teresa E.

McLaughlin, U.S. DEPARTMENT OF JUSTICE, APPELLATE SECTION TAX DIVISION, Washington, D.C., for Appellant. John Anthony Logan, Russell N. Cunningham, Paul L. Wright, WRIGHT & LOGAN, Dublin, Ohio, for Appellees. Nan M. Still, Larry R. Gearhardt, OHIO FARM BUREAU FEDERATION, INC., Columbus, Ohio, for Amicus Curiae.

GILMAN, J., delivered the opinion of the court, in which COLE, J., joined. JONES, J. (pp. 14-15), delivered a separate opinion dissenting from Part II.C. of the majority opinion.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. This dispute involves the proper tax treatment of payments received by Frederick and Ruth Wuebker under the United States Department of Agriculture's Conservation Reserve Program ("CRP"), 16 U.S.C. §§ 3801, 3831-36. The Commissioner of Internal Revenue determined that the amounts received by the Wuebkers under their CRP contract, less the deductions attributable thereto, constituted income from the trade or business of farming that was subject to the self-employment tax pursuant to § 1401 of the Internal Revenue Code. To the contrary, the Tax Court agreed with the Wuebkers' position that the payments constituted "rentals from real estate" that are specifically excludible from self-employment income pursuant to § 1402(a)(1) of the Internal Revenue Code. For the reasons set forth below, we **REVERSE** the Tax Court's decision.

## I.  BACKGROUND

### A.  Factual background

At all times relevant to this case, the Wuebkers resided in Fort Recovery, Ohio and jointly owned 258.67 acres of land, much of which was considered highly erodible. After farming

Wuebkers *inter alia* to seed and fertilize the acreage in accordance with USDA dictates, further constricted the land's utility. In my view, the USDA therefore exercised sufficient control of the CRP land that it can properly be viewed as "us[ing]" the land. For this reason, characterization of the CRP payment as a "rental[]" payment is entirely consistent with ordinary definitions of the term. Accordingly, I respectfully **DISSENT** from Part II.C. of the majority opinion, but join the opinion in all other respects.

---

**DISSENT**

---

NATHANIEL R. JONES, Circuit Judge, dissenting. Because I believe that the substantial and wide-ranging limitations imposed on the Wuebkers' use of their land by the CRP signals that the USDA did "use" the land as contemplated by ordinary definitions of "rent," I respectfully **DISSENT** from Part II.C. of the majority opinion.

The Internal Revenue Code does not define "rentals from real estate" for the purposes of § 1402(a)(1), and we therefore look to ordinary definitions of "rent" to ascertain the statute's meaning. *See Smith v. United States*, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."). As the majority notes, "[r]ent normally connotes '[c]onsideration paid for use or occupation of property." *Ante* at 11; *see Aujero v. CDA Todco, Inc.*, 756 F.2d 1374, 1376 (9th Cir. 1985) (quoting *Black's Law Dictionary* 1166 (5th ed. 1979)); *see also Black's Law Dictionary* (Westlaw 1999). While the USDA did not possess or occupy the Wuebkers' property in the traditional sense that gives rise to a tenant-landlord relationship, *see Restatement (Second) of Property* § 1.2 (1977) ("A landlord-tenant relationship exists only if the landlord transfers the right to possession of the leased property."), the CRP certainly placed a number of restrictions on the way in which the Wuebkers could use their land.

As the Tax Court found, the Wuebkers were prohibited from allowing any "grazing, harvesting, or other commercial use of the crop from the cropland," *see* J.A. at 35, and were required to implement the numerous requirements of the conservation plan. The USDA also retained a limited right to access the land to ascertain CRP compliance. By prohibiting all commercial farming, the USDA greatly reduced the range of uses to which the Wuebkers could put their property. The sundry dictates of the conservation plan, requiring the

most of the property for approximately twenty years, they decided to enroll a substantial portion of the land into the CRP. The CRP was established pursuant to the Food Security Act of 1985, Pub. L. No. 99-198, 99 Stat. 1354 (codified in scattered sections). It authorizes the Department of Agriculture to make payments to those owners and operators of land who agree to refrain from farming their property in order "to conserve and improve the soil and water resources of such lands." 16 U.S.C. § 3831(a). The Wuebkers agreed to enroll 214.9 of their acreage into the program because they felt that doing so would provide them with a more stable flow of income, benefit their land, and allow them to focus their efforts on their poultry operation.

The Wuebkers executed their CRP contract in November of 1991. Frederick Wuebker was listed as the operator of the land and Ruth Wuebker was listed as the owner. Pursuant to the contract, the Department of Agriculture—through the Commodities Credit Corporation ("CCC") and the Agricultural Stabilization and Conservation Service ("ASCS")—promised to pay the Wuebkers a "rental rate per acre" of $85 for a period of ten years. Pursuant to the contract, the "annual rental payment" is "based on an accepted bid multiplied by the number of determined acres which, subject to the availability of funds, may be paid to a participant to compensate such participant for placing eligible land in the Conservation Reserve Program."

In exchange for that payment, the Wuebkers agreed to, among other things, (1) implement a conservation plan, (2) establish vegetative cover, (3) "[n]ot engage in or allow grazing, harvesting, or other commercial use of the crop from the cropland," (4) "[n]ot harvest or sell, nor otherwise make commercial use of trees on the CRP land," (5) "[n]ot produce any agricultural commodity on highly erodible land,"(6) "[c]ontrol on [the] land . . . all weeds, insects, pests and other undesirable species," and (7) file annual CRP reports. The contract sets forth certain cost-sharing provisions, pursuant to which the CCC reimburses the Wuebkers for specific maintenance expenses. Furthermore, in order for an operator

of land to be eligible, the participant is required to "provide satisfactory evidence that such person will be in control of such cropland for the full term of the CRP contract period . . . ."  The contract also grants the CCC access to inspect the CRP land:

> Representatives of CCC shall have the right of access to [the] land subject to this contract and to examine any other lands or records under the participant's control for the purpose of determining land classification and erosion rates and for the purpose of determining whether there is compliance with the terms and conditions of this contract.

With respect to 181.9 of the 214.9 acres, the conservation plan established by the parties required the Wuebkers to (1) maintain vegetation throughout the life of the CRP contract, (2) spot mow or chemically treat noxious weeds "at any time," (3) periodically seed and cultivate the land using the "disc" and "harrow" methods, and (4) lime and fertilize the land as needed pursuant to ASCS tests.  The plan declared that the remaining 33.0 acres had adequate existing cover, requiring only spot mowing and vegetation maintenance.  A revision of the plan in March of 1992, however, required the Wuebkers to seed the entire 214.9 acres.  The Wuebkers accomplished these tasks by using their existing farming equipment, and a portion of their costs were reimbursed.  Most of the work was completed during the first year of the contract.

In 1992 and 1993, the Wuebkers received $18,190 and $18,267, respectively, under the CRP.  On their joint tax returns for those years, the Wuebkers reported the amounts as rents on Schedule E, the Supplemental Income Schedule.  They did not, however, include the payments in their computation of self-employment income.  As a result of an audit by the IRS, the Commissioner issued a notice of deficiency on March 4, 1996, claiming that the CRP payments constituted farm income rather than excludible rentals from real estate, and were therefore subject to the self-employment

(6th Cir. 1980) ("[C]ourts must look to the substance, rather than the form, of transactions to determine whether payments to a taxpayer constitute capital gain or ordinary income."); *Mitchell v. Commissioner*, 428 F.2d 259, 263 (6th Cir. 1970) ("It is a fundamental rule of taxation that form and labels must yield to reality.").  In fact, in setting forth the CRP payment rules, Congress expressly qualified its use of the term "rental" by providing that "[t]he amounts payable . . . *in the form of* rental payments under contracts entered into . . . may be determined through . . . the submission of bids . . . or . . . [through] other means . . . ."  16 U.S.C. § 3834(c)(2) (emphasis added).

The Tax Court also chose not to follow *Ray* and Revenue Ruling 60-32, asserting that neither decision addressed whether the payments fell within the rental exclusion.  A close reading of those decisions, however, reveals that the both the Tax Court and the IRS were aware of the rentals-from-real-estate exclusion.  In *Ray*, the Tax Court explicitly noted that the taxpayers had asserted that the exclusion should apply: "As to the year 1990, petitioners have conceded all respondent's adjustments to income except respondent's determination that petitioners' receipt of $43,469 of income in that year constituted income subject to self-employment tax, *rather than rental income as claimed by petitioners*." *Ray*, 1996 Tax Ct. Memo LEXIS 453, at *1 (emphasis added).  Similarly, the IRS in Revenue Ruling 60-32 specifically cites 26 U.S.C. § 1402(a)(1)—the rentals-from-real-estate exclusion provision—making it highly unlikely that the exclusion was not considered when the decision was rendered.  In sum, we find the Tax Court's attempt to distinguish these prior rulings unpersuasive.

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the Tax Court's decision.

347 F.2d at 165. Although it is true that the Department of Agriculture is seeking, and receiving, a public benefit by conserving lands enrolled in the CRP, the Wuebkers continue to maintain control over and free access to their premises. The dissent reasons that, because the government "greatly reduced the range of uses to which the Wuebkers could put their property," it exercised a level of control akin to "use." We remain unpersuaded, however, that the restrictions imposed by the Department of Agriculture on a farmer's use of his own land somehow translate into "use" by the Department itself.

The essence of the program is to prevent participants from farming the property and to require them to perform various activities in connection with the land, both at the start of the program and continuously throughout the life of the contract, with the government's access limited to compliance inspections. Given this arrangement, we disagree with the Tax Court's determination that the Wuebkers' maintenance obligations were legally insignificant.

We also note the Wuebkers' contention that their involvement with the CRP land was insufficient to constitute "material participation" within the meaning of § 1402(a)(1). This contention, however, has no bearing on whether the CRP payments constituted rentals from real estate. The issue of material participation arises only when there is an arrangement between an owner or tenant and another individual whereby the other individual is to produce agricultural or horticultural commodities on the land. No such arrangement is present in this case.

The Tax Court placed great emphasis on the fact that the CRP statute, regulations, and contract refer to the amounts received by participants in the program as "rental" payments. Although such references favor a conclusion that the payments should be treated as rent for the purposes of determining whether they should fall within the rentals-from-real-estate exclusion, they certainly do not compel such a conclusion. *See Cline v. Commissioner*, 617 F.2d 192, 195

tax. The notice assessed additional taxes of $1,685 and $1,640 for 1992 and 1993, respectively.

## B.  Procedural background

On June 6, 1996, the Wuebkers filed a timely petition with the Tax Court pursuant to 26 U.S.C. § 6213(a), challenging the additional assessments and contending that the CRP payments constituted rental income that should be excluded from net earnings subject to the self-employment tax. Although they stipulated to many of the facts involved in the case, the parties presented additional evidence on May 19, 1997.

In an opinion entered on August 27, 1998, the Tax Court agreed with the Wuebkers, concluding that because the plain language of the CRP statute, regulations, and contract all describe the payments as "rent," it should be considered as rental income for tax purposes. The Tax Court also noted that the Wuebkers' service obligations under the CRP contract "were not substantial and were incidental to the primary purpose of the contract." It characterized the payments as "compensation for the use restrictions on the land, rather than remuneration for the [Wuebkers'] labor." Finally, the Tax Court distinguished the Wuebkers' case from a prior Tax Court decision and an earlier revenue ruling holding that payments to farmers under similar conservation plans are, in fact, taxable as self-employment income.

In this appeal, the Commissioner contends that (1) the description of the payments as "rent" in the various CRP provisions does not compel the conclusion that they are, in substance, rentals from real estate for the purposes of the self-employment tax, (2) the CRP payments are in fact not "rent" because they are not made in exchange for the use or occupancy of land, and (3) the CRP payments are more properly characterized as self-employment income because they are made in lieu of farming income.

## II.  ANALYSIS

### A.  Standard of review

An order of the Tax Court is "subject to the same review . . . as a similar order of a district court."  26 U.S.C. § 7482(a)(3).  Thus, we will sustain the Tax Court's findings of fact unless they are clearly erroneous and we review its legal conclusions de novo. *See Kluener v. Commissioner*, 154 F.3d 630, 637 (6th Cir. 1998).

### B.  The CRP payments constitute self-employment income

The decision in this case hinges on whether the CRP payments are determined to be farm income or rental income. Although the Wuebkers' additional tax liability in the range of $1,600 to $1,700 for each tax year might appear to be relatively small, the implications of this decision loom large. The Commissioner in his brief asserts that the Department of Agriculture pays approximately $1.8 billion per year to farmers under the CRP.  With the self-employment tax currently set at the rate of 15.3%, *see* 26 U.S.C. § 1401(a), (b), the cumulative amount of tax dollars at stake—even after giving effect to the relevant caps and deductions—is obviously substantial.

In order to finance Social Security and Medicare benefits for the self-employed and their dependents, the government taxes the self-employment income of every individual. *See* 26 U.S.C. § 1401; *Patterson v. Commissioner*, 740 F.2d 927, 929 (11th Cir. 1984). "'[S]elf-employment income' means the net earnings from self-employment derived by an individual . . . ."  26 U.S.C. § 1402(b).  "'[N]et earnings from self-employment' means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle . . . ." *Id.* § 1402(a).  Thus, "[t]o be taxable as self-employment income, an individual's income must be (1) derived, (2) from a trade or business, (3) carried on by that individual."

"The term 'net earnings from self-employment' means the gross income derived by an individual from any trade or business carried on by such individual, . . . *except that in computing such gross income . . . there shall be excluded rentals from real estate . . .* together with the deductions attributable thereto . . . ."  26 U.S.C. § 1402(a) (emphasis added).  "Rentals from real estate" is not defined by the statute and, therefore, the phrase must be interpreted "in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).  The rentals-from-real-estate exclusion, however, is to be "narrowly construed." *Johnson v. Commissioner*, 60 T.C. 829, 833 (1973); *see also Delno v. Celebrezze*, 347 F.2d 159, 165 (9th Cir. 1965) (noting with respect to the Social Security Act's identical provision that "there is specific evidence that Congress intended the rental exclusion to be narrowly restricted to payments for occupancy only").

Rent is defined as "[c]onsideration paid . . . for the use or occupancy of property . . . ."  BLACK'S LAW DICTIONARY 1299 (7th ed. 1999); *see also Aujero v. CDA Todco, Inc.*, 756 F.2d 1374, 1376 (9th Cir. 1985) ("Rent normally connotes '[c]onsideration paid for use or occupation of property.'" (citation omitted)).  Here, the Wuebkers do not—and cannot—contend that the Department of Agriculture obtained the right to "occupy" the land enrolled in the CRP.  The government's access is limited to inspecting the property and determining whether the Wuebkers are in compliance with the contract.

Whether the CRP payments constitute consideration for the "use" of the Wuebkers' land is a closer question.  Citing the many objectives of the CRP, such as the reduction of soil erosion and the protection of the nation's long-term food production capabilities, the Wuebkers assert, and the dissent agrees, that the government is "using" the land in question. We believe, however, that such an argument impermissibly stretches the plain meaning of the term "use," especially in light of the narrow construction required of the rentals-from-real-estate exclusion. *See Johnson*, 60 T.C. at 833; *Delno*,

set forth in Part II.C. below, we find that the Tax Court's disregard of these prior decisions is unwarranted.

In support of their argument, the Wuebkers rely primarily on *Milligan v. Commissioner*, 38 F.3d 1094 (9th Cir. 1994), and *Gump v. United States*, 86 F.3d 1126 (Fed. Cir. 1996). The *Milligan* court held that termination payments received by an insurance agent under a noncompetition agreement did not derive from the taxpayer's business activity of insurance sales because they were not "tied to the quantity or quality of the taxpayer's prior labor . . . ." *Milligan*, 38 F.3d at 1098. In *Gump*, the court followed *Milligan* and ruled that monthly payments received by the taxpayer from his former employer did not derive from his insurance trade because they arose from the cessation of said business. *Gump*, 86 F.3d at 1128-29.

Both decisions, however, are factually distinguishable from the instant action. First, neither case involves the unique aspects of the CRP and the maintenance obligations attendant to the program. Second, unlike the situations in *Milligan* and *Gump*, the Wuebkers continued to engage in their business while they were receiving their CRP payments. Furthermore, although the Wuebkers argue that "the CRP payments were not conditioned upon any farming activity," their position is weakened by the fact that they were required to perform tasks that are intrinsic to the farming trade or business (e.g., tilling, seeding, fertilizing, and weed control) that required the use of their farming equipment.

## C.   The CRP payments are not excludible as rentals from real estate

The Tax Court, relying primarily on the language of the CRP statute, regulations, and contract, concluded that the CRP payments are not properly considered self-employment income because they fall within the rentals-from-real-estate exclusion. In his appeal, the Commissioner essentially argues that the nature, not the label, of the payments compel an opposite conclusion. We agree.

*Milligan v. Commissioner*, 38 F.3d 1094, 1097 (9th Cir. 1994).

Despite setting forth the definition of self-employment income and the general rules for determining whether monies received by a taxpayer should be included as such, the Tax Court did not expressly conclude in its opinion whether the CRP payments in this case constitute—in the first instance—self-employment income. Although we would normally remand for such a preliminary conclusion, a remand is not necessary where the lower court has implicitly made such a finding. *See Brown v. Baltimore & Ohio R.R. Co.*, 805 F.2d 1133, 1141 (4th Cir. 1986) ("The ordinarily preferred course . . . is to remand for first instance determination of the issue by the district court. . . . Nevertheless, where . . . the issue is narrow and specific, and the implicit determination clear beyond any doubt, we may yet review to avoid the expensive alternative of a remand for a practically assured *pro forma* express determination conforming to that one necessarily implicit in the judgment."). In proceeding directly to an analysis of whether the CRP payments fell within the rentals-from-real-estate exclusion, the Tax Court implicitly found that, should the exclusion not apply, the payments would be taxable as self-employment income. Based on this conclusion, and in light of the fact the parties have briefed the question on appeal, the issue is ripe for review.

In response to the Commissioner's appeal, the Wuebkers do not assert that the "trade or business" or "carried on" requirements are lacking in this case. Rather, they argue that the CRP payments do not constitute self-employment income because they do not "derive" from their farming business. The Commissioner contends, in reply, that a sufficient nexus exists between the CRP payments and the Wuebkers' farming operations. As explained below, we believe that the Commissioner's contention represents the stronger argument.

"The term 'derive' requires 'a nexus between the income received and a trade or business that is, or was, actually carried on.'" *Milligan*, 38 F.3d at 1098 (quoting *Newberry v.*

*Commissioner*, 76 T.C. 441, 444 (1981)). Similarly, the income "must arise from some actual (whether present, past, or future) income-producing activity of the taxpayer . . . ." *Newberry*, 76 T.C. at 446.

In *Ray v. Commissioner*, 72 T.C.M. (CCH) 780, 1996 Tax Ct. Memo LEXIS 453 (1996), the Tax Court considered the nature of CRP payments such as those involved in this case. Connie Ray, the taxpayer, was engaged in the business of farming and cattle grazing. He eventually purchased additional property that had previously been enrolled in the CRP by the seller. Ray became a party to a new contract with the CCC, requiring him to assume obligations similar to those undertaken by the Wuebkers in this case. During the years in question, Ray and his wife did not report the CRP payments as self-employment income. After the IRS assessed a deficiency, Ray filed a petition challenging the Commissioner's characterization of the payments. The Tax Court, in holding that the payments constituted self-employment income, focused on the relationship between the CRP payments and Ray's farming and ranching business:

> Petitioner Connie Ray was a farmer and rancher and had apparently been so for some years. He owned and operated farmlands in Texas. As an addition to his holdings, he acquired the CRP tract and, by agreement with the CCC, he continued in effect the existing contractual relationship under the CRP program. Under this program, he was required to tend and nourish the land, fight diseases, and control soil erosion. What he could not do is to farm or graze the land. In other words, in return for nurturing and conserving the CRP acreage, but not farming or grazing it, he would and did receive a fee from CCC. Since the CRP acreage was added to his existing farmland, and since petitioner Connie Ray was already in the business of farming and ranching, this was a payment to him in connection with his ongoing trade or business.

*Id.* at *5. In conclusion, the Tax Court stated that "Ray was an active farmer/rancher with respect to additional acreage [enrolled in the CRP], and the payments . . . had a direct nexus to his trade or business." *Id.* at *7.

The facts of *Ray* are almost identical to those in the case before us, and the decision's reasoning is sound. Like Ray, the Wuebkers were engaged in the business of farming prior to and during the term of their CRP contract. Their agreement with the CCC required them to perform several ongoing tasks with respect to the land enrolled in the CRP, the very land they already owned and had previously farmed. As the Tax Court concluded in *Ray*, the CRP payments to the Wuebkers were "in connection with" and had a "direct nexus to" their ongoing trade or business.

Revenue Ruling 60-32, 1960-1 C.B. 23, further supports the above conclusion. Issued in connection with the CRP's predecessor agricultural plan, the Soil Bank Program, 7 U.S.C. §§ 1801-37 (repealed 1965), the ruling expressed the IRS's opinion that "[p]ayments and benefits attributable to the acreage reserve program are includible in determining the recipient's net earnings from self-employment if he operates his farm personally or through agents or employees." Although not binding on this court, a revenue ruling constitutes the studied view of the IRS and is "entitled to some deference unless 'it conflicts with the statute it supposedly interprets or with that statute's legislative history or if it is otherwise unreasonable.'" *CenTra, Inc. v. United States*, 953 F.2d 1051, 1056 (6th Cir. 1992) (quoting *Threlkeld v. Commissioner*, 848 F.2d 81, 84 (6th Cir. 1988)). Because the Soil Bank Program was substantially the same as the CRP, *see Peterson v. Chater*, 72 F.3d 675, 677 (8th Cir. 1995) ("CRP has been called 'Son of Soil Bank.'"), and because the judgment expressed in Revenue Ruling 60-32 is not an unreasonable interpretation, we find it persuasive.

The Tax Court's decision under review expressly distinguishes *Ray* and Revenue Ruling 60-32. For the reasons