RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0370P (6th Cir.)
File Name: 03a0370p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

AEROQUIP-VICKERS, INC. AND
SUBSIDIARIES, f/k/a Trinova
Corp. and Subsidiaries,
    *Petitioner-Appellee,*

    *v.*

COMMISSIONER OF INTERNAL
REVENUE,
    *Respondent-Appellant.*

No. 01-2741

On Appeal from a Decision of the United States Tax Court.
No. 02931-94—Mary Ann Cohen, Chief Tax Court Judge.

Argued: April 30, 2003

Decided and Filed: October 20, 2003

Before: CLAY and GIBBONS, Circuit Judges;
DUGGAN, District Judge.[*]

_____

[*] The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

_____

## COUNSEL

**ARGUED:** Frank P. Cihlar, UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION, TAX DIVISION, Washington, D.C., for Appellant. Thomas V.M. Linguanti, BAKER & McKENZIE, Chicago, Illinois, for Appellee. **ON BRIEF:** Frank P. Cihlar, Joel L. McElvain, UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION, TAX DIVISION, Washington, D.C., for Appellant. Thomas V.M. Linguanti, Frederick E. Henry III, Robert S. Walton, BAKER & McKENZIE, Chicago, Illinois, for Appellee.

GIBBONS, J., delivered the opinion of the court, in which DUGGAN, D. J., joined. CLAY, J. (pp. 19-41), delivered a separate dissenting opinion.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge. In 1986, petitioner-appellee Aeroquip-Vickers, Inc. (formerly known as Trinova Corporation, and operating as the Libbey-Owens-Ford Company (LOF) at the time), transferred all of its assets relating to a glass manufacturing business, including property for which it had previously claimed investment tax credits (ITCs) under former 26 U.S.C. § 38 (Section 38 property), into a wholly-owned subsidiary, LOF Glass, Inc. (LOF Glass). LOF then transferred LOF Glass to one of its shareholders, Pilkington Holdings, in return for Pilkington Holdings' shares in LOF. LOF treated this transaction as a corporate reorganization under 26 U.S.C. § 368(a)(1)(D) and accordingly did not recognize any gain or loss from the exchange on the consolidated federal income tax return for 1986 that it filed together with LOF Glass. LOF also did not

report any recaptured ITCs from the transaction, as would be required by former 26 U.S.C. § 47(a)(1) upon the disposition of Section 38 property before the end of the property's estimated useful life.

In 1993, the Commissioner of Internal Revenue (CIR) asserted a deficiency against LOF for LOF's failure to include ITC recapture in income under former 26 U.S.C. § 47(a)(1) on its 1986 consolidated tax return. Trinova petitioned the United States Tax Court for a redetermination of the deficiency. The Tax Court held that neither the transfer of the property from LOF to LOF Glass nor the change in ownership of LOF Glass was a disposition of Section 38 property under 26 U.S.C. § 47, and that Trinova thus had no recapture obligations. CIR appealed. For the reasons set forth below, we reverse the decision of the Tax Court.

## I.

The facts are not disputed. Pursuant to Tax Court Rule 91(a), the parties submitted a Stipulation of Facts, which the Tax Court summarized as follows:

Petitioner, an accrual basis taxpayer . . . changed its name to Trinova from the Libbey-Owens-Ford Company (LOF) on July 31, 1986. Petitioner timely filed a consolidated Federal income tax return with certain of its subsidiaries for the years at issue with the Internal Revenue Service Center, Cincinnati, Ohio, or the Internal Revenue Service office in Toledo, Ohio. Petitioner was engaged in the fluid power and plastics businesses and the manufacture of glass. The glass business was referred to as "LOF Glass Division."

One of LOF's largest shareholders was Pilkington Brothers (Pilkington), an English company, which owned 29 percent of petitioner's common stock through its wholly owned U.S. subsidiary, Pilkington Holdings, Inc. (Pilkington Holdings). Two of petitioner's fourteen

directors were associated with Pilkington. In late 1985, Pilkington approached LOF and began negotiations concerning the possibility of acquiring the glass business.

Earlier that year, on July 25, 1985, the board of directors of LOF approved the transfer of the glass business to a wholly owned subsidiary for valid business reasons. On February 19, 1986, LOF Glass, Inc. was incorporated as a wholly-owned subsidiary of LOF. On March 6, 1986, a "Transfer and Assumption Agreement," amended on April 25, 1986, transferred to LOF Glass, Inc., all assets associated with the LOF Glass Division, including inventories and receivables, effective retroactively to February 19, 1986. These assets also included section 38 assets upon which LOF had previously claimed ITCs. Petitioner took no formal action contemplating the liquidation of LOF Glass, Inc., in the event that the acquisition by Pilkington did not take place.

On March 7, 1986, LOF, Pilkington, and Pilkington Holdings entered into an agreement, amended on April 28, 1996, whereby LOF would transfer all of its shares of LOF Glass, Inc., to Pilkington Holdings in exchange for all of the shares of petitioner held by Pilkington Holdings. On April 28, 1996, Pilkington Holdings exchanged 4,064,550 shares of LOF for the shares of LOF Glass, Inc. LOF Glass, Inc., continued to operate the glass business as a subsidiary of Pilkington Holdings and used the section 38 assets in its trade or business.

The parties have stipulated that petitioner recognized no gain or loss upon the transaction whereby its glass business was transferred to LOF Glass, Inc., pursuant to the provisions of section 351 or sections 354, 355, and 368(a)(1)(D) (except as required by such sections or section 357(c)), and that pursuant to section 355 neither petitioner nor Pilkington Holdings recognized any gain

or loss upon the exchange of LOF Glass, Inc., shares for the LOF shares.

Before February 19, 1986, income, deductions, and credits with respect to the LOF Glass Division were included in petitioner's return. From February 19, 1986, through April 28, 1986, deductions and credits with respect to LOF Glass, Inc. (the subsidiary), were included as part of petitioner's consolidated return. After April 28, 1986, LOF Glass, Inc., was no longer part of petitioner, petitioner's affiliated group, or petitioner's consolidated Federal income tax return.

On its 1986 consolidated return, petitioner did not include any amount of ITC recapture with respect to the LOF Glass, Inc., section 38 assets. Respondent determined that a $5,718,749 ITC recapture arose from the April 1986 transaction. Petitioner does not dispute the amount of the ITC recapture. . . .

On November 26, 1993, CIR issued a notice of deficiency to Trinova, stating that Trinova had understated its tax liabilities on the consolidated income tax returns that it had filed with its subsidiaries between 1985 and 1988. On February 18, 1994, Trinova filed a petition with the Tax Court contesting the deficiencies, including CIR's recapture of ITCs under 26 U.S.C. § 46. On February 27, 1997, the Tax Court found in favor of Trinova on the issue of the recapture of the ITCs. On October 1, 2001, the Tax Court entered a decision disposing of all claims of all parties. CIR timely filed a notice of appeal.

## II.

The Tax Court's application of law to the fully stipulated record is reviewed *de novo*. *See Friedman v. Comm'r*, 216 F.3d 537, 541 (6th Cir. 2000).

Under former 26 U.S.C. §§ 38 and 46, a taxpayer who acquired certain machinery and equipment for use in its trade or business (Section 38 property) was allowed a credit against its income tax liability in an amount equal to a percentage of his investment (the ITC). However, under former 26 U.S.C. § 47, the ITC was limited to property that the taxpayer used in its trade or business for most of the property's useful life. If the taxpayer disposed of Section 38 property before the end of the useful life, then the taxpayer was required to recapture the ITC and increase its tax liability. *See* 26 U.S.C. § 47(a)(1). The stated purpose of this provision was "[t]o guard against a quick turnover of assets by those seeking multiple credit." S. Rep. No. 1881, 87th Cong., 2d Sess. 11 (1962).

Determining that Trinova was not liable for ITC recapture, the Tax Court emphasized that "the transactions herein took place in the consolidated return context." Section 1.1502-3(f)(2)(i) of the Consolidated Return Regulations (CRR) states that "a transfer of section 38 property from one member of the group to another member of such group during a consolidated return year shall not be treated as a disposition or cessation within the meaning of section 47(a)(1)." Defending the Tax Court's application of this provision to the facts in this case, Aeroquip-Vickers observes that "[a]fter [LOF] transferred the LOF Glass Division business . . . to LOF Glass including some section 38 property, LOF Glass continued to use the section 38 property while a member of the [LOF] affiliated group," and thus asserts that the "transfer of the section 38 property to LOF Glass . . . was a non-event under section 47; there was no 'disposition' of section 38 property." In addition, Aeroquip-Vickers argues that "this non-event for section 37 purposes did not metamorphose into an ITC recapture event merely because LOF glass ultimately left the [LOF] affiliated group" since "LOF Glass continued to use the section 38 property up to and following the time that LOF Glass left the [LOF] affiliated group." Aeroquip-Vickers thus claims that "there would be no recapture event

unless or until *LOF Glass* disposed of the section 38 property." (emphasis in brief).

In support of its decision, the Tax Court relied upon CRR § 1.1502-3(f)(3), which provides the following examples:

Example (1). P, S, and T file a consolidated return for calender year 1967. In such year S places in service section 38 property having an estimated useful life of more than 8 years. In 1968, P, S, and T file a consolidated return and in such year S sells such property to T. Such sale will not cause section 47(a)(1) to apply.

* * *

Example (3). Assume the same facts as in example (1), except that P, S, and T continue to file consolidated returns through 1971 and in such year T disposes of the property to individual A. Section 47(a)(1) will apply to the group . . .

* * *

Example (5). Assume the same facts as in example (1), except that in 1969, P sells all the stock of T to a third party. Such sale will not cause section 47(a)(1) to apply.

The Tax Court first noted that "the mere transfer of section 38 assets within a consolidated group does not trigger recapture" and then added that Example 5 illustrated that "the transfer of the stock of [LOF Glass] to Pilkington Holdings would *not* trigger the recapture of such credit." *Trinova Corp. v. Commissioner*, 108 T.C. 68, 73 (1997) (emphasis added).

CIR argues that the Tax Court erred by failing to give appropriate deference to Revenue Ruling 82-20. Revenue rulings are official interpretations by the IRS which have been published in the Internal Revenue Bulletin. 26 CFR § 601.201(a)(6). Under the facts assumed by Revenue Ruling 82-20, parent corporation P owns 100 percent of subsidiary

corporation S. P and S file a consolidated federal income tax return. A and B, equal owners of P, decide to split the business into two independent corporations, one owned by A and the other owned by B. To achieve this, "P transferred all the assets of one of the businesses necessary to conduct the trade or business, including section 38 property, to S solely in exchange for additional shares in S and immediately thereafter distributed all the stock of S to A. . . . A surrendered all its stock in P as part of the transaction." *Id.* Revenue Ruling 82-20 states that:

When there is no intention at the time of transfer to keep the property within the consolidated group, the transaction should be viewed as a whole and not as separate individual transactions. . . . Because the transfer of the section 38 property from P to S is a step in the planned transfer of the property outside the group, the exception in section 1.1502-3(f)(2)(i) of the regulations does not apply to this transaction. Therefore, the transfer from P to S is a disposition under section 47(a)(1) of the Code.

*Id.*

Rejecting CIR's position, the Tax Court concluded that "Example 5 and not Rev. Rul. 82-20 . . . provides the key to decision herein." *Trinova Corp. v. Comm'r*, 108 T.C. 68, 77 (1997). The Tax Court acknowledged that both the Second Circuit in *Salomon Inc. v. United States*, 976 F.2d 837 (2d Cir. 1992) and the Ninth Circuit in *Walt Disney Inc. v. Comm'r*, 4 F.3d 735 (9th Cir. 1993), cases involving "factual situation[s] substantially similar to that involved herein," had reached the opposite conclusion. However, the Tax Court explained that

[w]ith all due respect, we disagree with both the result and the reasoning of the Courts of Appeals. . . . We think that the fact that the transfer of the assets and the transfer of the stock occurred in the same, rather than different,

taxable years does not provide a meaningful basis for distinguishing Rev. Rul. 82-20 . . . from Example 5 of the regulations. . . . We think the Courts of Appeals for the Second and Ninth Circuits accorded the ruling undue weight and that revenue rulings play a lesser role than the language of the opinions of those Courts of Appeals seems to indicate.

*Trinova Corp.*, 108 T.C. at 76-77. The Tax Court also added that in this case CIR "has stipulated that there was a business purpose, i.e. substance, to the transfer by petitioner to [LOF Glass]." *Id.* at 78.

In *Salomon*, Engelhard Minerals and Chemicals Corporation (EMC) (later known as Salomon) developed a plan to separate its marketing arm and its industrial divisions into two independent companies. 976 F.2d at 838. EMC transferred the assets and liabilities of its industrial divisions to Porocel, an existing wholly owned subsidiary (later renamed Engelhard Corporation (EC)). *Id.* In return, EMC received EC stock. *Id.* Four days later, EMC "[spun] off" EC "by distributing all of its EC shares pro-rata to its stockholders." *Id.* The IRS determined that EMC would not recognize gain as a result of the transaction. *Id.* at 839. However, the IRS also noted that "[c]ertain of the machinery, equipment and other assets that EMC planned to transfer to EC qualified as section 38 property," and concluded that the "transfer of this property to EC followed by a spin-off to EMC shareholders [was] a 'disposition' which triggered § 47(a) recapture." *Id.* at 840. Salomon brought suit to recover the recapture taxes paid. *Id.*

The Second Circuit concluded that Revenue Ruling 82-20 was not "unreasonable, nor inconsistent with prevailing law," and thus was "entitled to great deference." *Id.* at 841. The Second Circuit explained that since a direct transfer of Section 38 property was a disposition under 26 U.S.C. § 47(a)(1), "the more circuitous transfer by way of another consolidated group member should be as well." *Id.* at 842.

In substance, if not in form, the direct and the circuitous transaction are the same. Each achieves a rapid transfer of section 38 property outside the group. To distinguish between them would deny economic reality. Moreover, such a holding would allow the common parent of a consolidated group, such as EMC, to move section 38 property outside the group without paying recapture taxes simply by first transferring the property to a member subsidiary and then distributing the subsidiary's stock to the third-party. Revenue Ruling 82-20's requirement of recapture under these circumstances is not unreasonable.

* * *

The rapidity with which these components follow one another suggest that they are, in substance, parts of one overall transaction intended to dispose of the section 38 assets outside of the consolidated group. Revenue Ruling 82-20 further solidifies this inference by positing that there is "no intention at the time of transfer to keep the property within the consolidated group." These factual circumstances, timing and intent, differ from those presented in CRR Example 5. They lead to the conclusion that the two components are steps in a larger transaction which, when viewed as a whole, constitutes a § 47(a)(1) "disposition."

*Id.* at 842 (citations omitted).

The reasoning and conclusion of the Second Circuit was subsequently adopted by the Ninth Circuit in *Walt Disney*. In that case, Retlaw, a predecessor of Walt Disney Inc. (Disney), developed a plan to separate its "Disney assets" (including the commercial rights to the name "Walt Disney" and two attractions at Disneyland) from its "non-Disney assets" (two television stations, a cattle ranch, and several agricultural properties), and then allow Walt Disney Productions (Productions) to acquire Retlaw (which would only retain its

Disney assets). *Walt Disney*, 4 F.3d at 737. In order to accomplish this, Retlaw transferred its non-Disney assets, which included Section 38 property, to a newly-formed, wholly owned subsidiary called Flower Street. *Id.* In exchange, Retlaw received Flower Street common stock. *Id.* That same day, the Retlaw board of directors authorized the distribution of the Flower Street stock pro rata to the Retlaw shareholders, but specified that the distribution could only be made concurrently with the closing of Productions' proposed acquisition of Retlaw. *Id.* The actual distribution occurred fifty-nine days later, immediately following the approval of the Retlaw acquisition by Productions' shareholders and just prior to Productions' acquisition of the stock of Retlaw. *Id.* at 738.

Retlaw and Flower Street then filed a consolidated federal income tax return. *Id.* In the consolidated return, however, Retlaw did not recapture the ITCs it previously had taken on Section 38 property included among the non-Disney assets transferred to Flower Street. *Id.* As a result, the IRS assessed a deficiency, which Disney contested. *Id.* Reversing the decision of the Tax Court, the Ninth Circuit applied Revenue Ruling 82-20 and determined that Disney was required to recapture the ITC it had previously taken with respect to Section 38 property transferred by Retlaw to Flower Street. *Id.* at 739. The Ninth Circuit explained that

> Revenue Ruling 82-20 is not unreasonable because "[i]n substance, if not in form, the direct and the circuitous transaction are the same" and "to distinguish between them would deny economic reality" and would allow the common parent of a consolidated group to circumvent easily the recapture requirement. Moreover, Revenue Ruling 82-20 and Example 5 of the Consolidated Return Regulations are not inconsistent because they address different situations: the latter covers situations where, due to a "meaningful time delay" between the asset transfer and the spin-off, there is "little reason to believe that the transferor corporation intends to use the

> transaction as a means of moving section 38 property out of the group while avoiding recapture taxes"; the former involves facts under which the transferor's initial intent to move section 38 property out of the consolidated group is undisputed.

*Id.* (quoting *Salomon*, 976 F.2d at 842) (internal citations omitted).

As the Tax Court observed, both the Second Circuit and the Ninth Circuit afforded "great deference" to Revenue Ruling 82-20. This court previously has held that "[a]lthough a revenue ruling 'is not entitled to the deference accorded a statute or a Treasury Regulation,' a revenue ruling is entitled to some deference unless 'it conflicts with the statute it supposedly interprets or with that statute's legislative history or if it is otherwise unreasonable.'" *CenTra, Inc. v. United States*, 953 F.2d 1051, 1056 (6th Cir. 1992) (quoting *Threlkeld v. Comm'r*, 848 F.2d 81, 84 (6th Cir. 1988)); *see also Johnson City Med. Ctr. v. United States*, 999 F.2d 973, 977 (6th Cir. 1993) ("[T]his Court accords deference to Revenue Ruling 85-74 under the standard set forth in *Chevron* [*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984)]."[1]); *Wuebker v. Comm'r*, 205 F.3d 897, 903 (6th Cir. 2000).

However, recent Supreme Court decisions limiting the *Chevron* doctrine have called our earlier cases into question. In *Christensen v. Harris County*, 529 U.S. 576, 587 (2000), the Supreme Court held that "[i]nterpretations such as those in opinion letters – like interpretations contained in policy

---

[1] "When Congress has 'explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,' *Chevron*, 467 U.S. at 843-844, and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (explaining the application of the *Chevron* test).

statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference." The Court explained that such agency interpretations are entitled to respect, "but only to the extent that those interpretations have the 'power to persuade.'" *Id.* (quoting *Skidmore v. Swift & Co.*, 323 US. 134, 140 (1944)). In *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001), the Supreme Court emphasized that *Chevron* deference is appropriate only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority" through "notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." The Court added that "an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires." *Id.* at 234 (quoting *Skidmore*, 323 U.S. at 139-40). In *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001), the Supreme Court declined to consider "whether the Revenue Rulings themselves are entitled to deference." However, the Court noted that the revenue rulings at issue "reflect the agency's longstanding interpretation of its own regulations," and concluded that "[b]ecause that interpretation is reasonable, it attracts substantial judicial deference." *Id.*

When promulgating revenue rulings, the IRS does not invoke its authority to make rules with the force of law. Specifically, the IRS does not claim for revenue rulings "the force and effect of Treasury Department regulations." Rev. Proc. 89-14, 1989-1 C.B. 814. In light of the Supreme Court's decisions in *Christensen* and *Mead*, we conclude that Revenue Ruling 82-20 should not be accorded *Chevron* deference. Revenue rulings do, however, constitute "precedents to be used in the disposition of other cases." Rev. Proc. 89-14, 1989-1 C.B. 815. Revenue rulings also serve as "official interpretation[s]" by the IRS of the tax laws. Treas.

Reg. § 601.201(a)(6). By noting only that revenue rulings "are not entitled to the deference accorded a statute or a Treasury Regulation," without explicitly acknowledging that some deference to revenue rulings is proper, the Tax Court mischaracterized the degree of deference accorded to revenue rulings. *See, e.g., Omohundro v. United States*, 300 F.3d 1065, 1069 (9th Cir. 2002) (granting *Skidmore* deference to a revenue ruling); *Del Commercial Props., Inc. v. Comm'r*, 251 F.3d 210, 214 (D.C. Cir. 2001) (same); *U.S. Freightways Corp. v. Comm'r*, 270 F.3d 1137, 1142 (7th Cir. 2001) (same); *American Express Co. v. United States*, 262 F.3d 1376, 1383 (Fed. Cir. 2001) (reasoning that "[i]n the context of tax cases, the IRS's reasonable interpretations of its own regulations and procedures are entitled to particular deference." (citing *Cleveland Indians*, 532 U.S. at 220)).[2] Consequently, the level of deference to be accorded to Revenue Ruling 82-20 depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Mead*, 533 U.S. at 228 (quoting *Skidmore*, 323 U.S. at 140). Consideration of all of these factors leads us to conclude that some deference to Revenue Rule 82-20 is proper.[3]

Aeroquip-Vickers argues that "neither the ITC regime nor the consolidated return regulations contain any ambiguity justifying Rev. Rul. 82-20." Aeroquip-Vickers further contends that Revenue Ruling 82-20 is inconsistent with

---

[2]A recent Tax Court Memorandum decision also grants a revenue ruling *Skidmore* deference. *See Tedoken v. Comm'r*, 84 T.C.M. (CCH) 657 (2002).

[3]As Judge Swift of the Tax Court noted below in dissent, "[t]he weight to be given a revenue ruling is not the issue in this case. Rather, the issue is the validity of the underlying rationale of Rev. Rul. 82-20." (JA 198.) Put differently, the amount of deference to be accorded to Revenue Ruling 82-20 ultimately turns upon the validity of its reasoning.

§ 1.1502-3(f) because the express terms of § 1.1502-3(f) do not explicitly refer to "intent" or "timing" requirements. As previously discussed, substantially similar challenges to Revenue Ruling 82-20 were considered and rejected by both the Second and Ninth Circuits in *Salomon* and *Walt Disney*. "Uniformity among the circuits is especially important in tax cases to ensure equal and certain administration of the tax system. We would therefore hesitate to reject the view of another circuit." *Nickell v. Comm'r*, 831 F.2d 1265, 1270 (6th Cir. 1987).

Moreover, the approach favored by CIR and adopted by the Second and Ninth Circuits is entirely reasonable. Example 5 of CRR § 1.1502-3(f) involves a situation where the asset transfer occurs in one year and the spin-off takes place in the following year, while Revenue Ruling 82-20 applies to situations where (as in the instant case) the asset transfer is "immediately" followed by the spin-off. Whether the use of different years "merely illustrate[s] the sequence of events," as Aeroquip-Vickers argues, or rather signifies a "meaningful time delay" between the two steps, *Salomon*, 976 F.2d at 842, is an extremely close question. However, the more persuasive interpretation is that the decision to assign different events to different calender years in Example 5 of CRR § 1.1502-3(f), rather than merely listing the order of events, has greater significance. *See* 2A Singer, Norman J., *Sutherland Statutes and Statutory Construction*, § 46.06 at 192 (2000 ed.) ("every word of a statute must be presumed to have been used for a purpose"). Consequently, we conclude that the underlying rationale of Revenue Ruling 82-20 is valid, "reflect[s] the agency's longstanding interpretation of its own regulations," and thus deserves "substantial judicial deference." *Cleveland Indians Baseball Co.*, 532 US. at 220.

Aeroquip-Vickers also argues that the "step transaction doctrine" is inapplicable in this case, since CIR has stipulated that valid business reasons existed for the intermediate steps taken by LOF. The step-transaction doctrine was not directly addressed in either *Salomon* or *Disney*. However, as Judge

Swift of the Tax Court observed in his dissenting opinion, both of those decisions "rel[ied] heavily on 'economic reality' and the 'substance-over-form' doctrines, which are simply broader labels for, and which encompass, the step transaction doctrine." *Trinova Corp. v. Commissioner*, 108 T.C. 68, 79 (1997) (Swift, J., dissenting). When analyzing the question of whether the separate steps of a complex transaction should be treated as having independent significance or as related steps in a unified transaction, "courts have enunciated a variety of doctrines, such as step transaction, business purpose, and substance over form. Although the various doctrines overlap and it is not always clear in a particular case which one is most appropriate, their common premise is that the substantive realities of a transaction determine its tax consequences." *King Ent. Inc. v. United States* 418 F.2d 511, 516 n. 6 (Ct. Cl. 1969); *see also Comm'r v. Court Holding Co.*, 324 U.S. 331, 334 (1945) ("The incidence of taxation depends upon the substance of a transaction."); *Brown v. United States*, 782 F.2d 559, 563 (6th Cir. 1986) ("The step transaction doctrine is a judicial device expressing the familiar principle that in applying the income tax laws, the substance rather than the form of the transaction is controlling.") (quotation omitted).

This court has applied the "end result" test in order to determine whether the steps of a transaction should be treated separately or as a single unit. *Brown*, 782 F.2d at 563-564. "Under that test, purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction *intended from the outset* to be taken for the purpose of reaching the ultimate result." *Id.* at 564 (quotations omitted) (emphasis added).

A recitation of the stipulated facts supports the conclusion that LOF entered the transaction with the intent to move Section 38 property out of the consolidated group. In late 1985 representatives of Pilkington approached LOF concerning the possibility of acquiring its glass business.

Negotiations concerning this transaction took place between November 1985 and March 1986. LOF's transfer of its glass business and its Section 38 property to LOF Glass occurred on March 6, 1986. One day later, LOF, Pilkington, and Pilkington Holdings entered into an agreement providing that LOF would transfer all of its interest in LOF Glass to Pilkington Holdings in exchange for Pilkington Holdings' entire interest in LOF. On April 28, 1986, Pilkington exchanged shares of LOF for the shares of LOF Glass. After that date, LOF Glass was no longer part of LOF's affiliated group, nor was it part of LOF's consolidated federal income tax return. From the beginning, an intent on the part of LOF to move Section 38 property out of the consolidated group without paying recapture taxes by first transferring the property to LOF Glass and then distributing LOF Glass's stock to Pilkington is evident.

Aeroquip-Vickers argues that, unlike in *Disney* and *Salomon*, in this case CIR "stipulated to the propriety not only of each step but also of the entire reorganization and split-off." Aeroquip-Vickers contends that since "the whole transaction and each step along the way had economic substance," no "tax avoidance motive" can be attributed to LOF.

Admittedly, this case does not involve a situation where "[t]he whole undertaking . . . was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, *and nothing else*." *Gregory v. Helvering*, 293 U.S. 465, 470 (1935) (emphasis added). Aeroquip-Vickers correctly notes that CIR has stipulated that the requirements of 26 U.S.C. § 368(a)(1)(D) were met in this case. The individual steps of the transaction had a valid business purpose. However, "[t]he law is unclear as to the relationship between the step transaction doctrine and the business purpose requirement. Our survey of the relevant cases suggests that no firm line delineates the boundary between the two." *Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1526 (10th Cir. 1991). In *Associated*

*Wholesale Grocers*, the Tenth Circuit held that the existence of a valid business purpose does not preclude application of the step transaction doctrine, explaining that "'[a] legitimate business goal does not grant [a] taxpayer carte blanche to subvert Congressionally mandated tax patterns.'" *Id.* at 1527 (quoting *Kuper v. Comm'r*, 533 F.2d 152, 158 (5th Cir. 1976)). The substance over form inquiry thus is not as narrow as Aeroquip-Vickers suggests.

Here, although the individual steps of the transaction had a legitimate business reason, the transaction must be treated as a single unit and judged by its end result. "To ratify a step transaction that exalts form over substance merely because the taxpayer can either (1) articulate some business purpose allegedly motivating the indirect nature of the transaction or (2) point to an economic effect resulting from the series of steps, would frequently defeat the purpose of the substance over form principle." *True v. United States*, 190 F.3d 1165, 1177 (10th Cir. 1999). Aeroquip-Vickers has shown only the existence of a non-tax business purpose for engaging in a series of transactional steps "to accomplish a result [it] could have achieved by more direct means." *Id.* (quoting *Associated Wholesale Grocers*, 927 F.2d at 1527). Notwithstanding this business purpose, CIR correctly concluded that the intended end result of the transaction was to allow LOF to avoid liability for ITC recapture.

### III.

For the foregoing reasons, we reverse the decision of the Tax Court.

---

### DISSENT

---

CLAY, Circuit Judge, dissenting. The majority overstates the level of deference revenue rulings receive. The Supreme Court's decision in *United States v. Mead*, 533 U.S. 218 (2001), compels me to respectfully dissent. New circuit precedents, in *Omohundro v. United States*, 300 F.3d 1065 (9th Cir. 2003) (per curiam), *U.S. Freightways Corp. v. Commissioner*, 270 F.3d 1137 (7th Cir. 2001), and *American Express Co. v. United States,* 262 F.3d 1376 (Fed. Cir. 2001), are cited by the majority to temper the impact of *Mead*. But as discussed below, these cases do not diminish *Mead* nearly to the extent that would be necessary to reach the result arrived at by the majority. I also wish to emphasize that assuming, *arguendo*, we wanted to defer to expertise, we would affirm the Tax Court.

This opinion is noteworthy because it involves a three-judge panel of the Court of Appeals reversing (by a two-to-one vote) a "fully reviewed" (effectively "en banc") eleven-to-six decision by the United States Tax Court, which handles only complex tax disputes and consists of seventeen eminent jurists who specialize exclusively in tax law. An overwhelming majority of the Tax Court found Commissioner's Revenue Ruling unpersuasive, although two of three judges of this Court find the Revenue Ruling compelling—in part because Commissioner drafted the regulation. Commissioner is also a party to this dispute; in fact, the IRS seeks to collect millions of dollars. The Tax Court's experts have no stake in the outcome.

To simplify this controversy: two different kinds of tax guidelines conflict. On its face, a treasury regulation, § 1.1502-3(f), seems to support Taxpayer. An interpretation of that regulation, Rev. Rul. 82-20, seems to support

Commissioner. The question is whether the regulation itself or the Revenue Ruling governs the disputed transaction.

### I.

In footnote three, the majority explains that "the amount of deference to be accorded to Rev. Rul. 82-20 ultimately turns upon the validity of its reasoning." I completely agree. Mysteriously, however, the majority also states that the Tax Court erred "[b]y noting only that revenue rulings 'are not entitled to the deference accorded a statute or a Treasury regulation,' without explicitly acknowledging that some deference to revenue rulings is proper." To the extent the majority implies that a revenue ruling could ever receive more deference than its persuasive value warrants, the majority is incorrect.

As the majority properly notes, the Supreme Court's decision in *United States v. Mead*, 533 U.S. 218 (2001), restricted the scope of *Chevron* deference.[1] *Mead* involved a tariff ruling by the Customs Service that classified Mead's "day planners" as diaries for assessment purposes under the Harmonized Tariff Schedule of the United States, 19 U.S.C. § 1202. 533 U.S. at 224. After reviewing *Chevron*, the Court stressed that "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative

---

[1] The Supreme Court foreshadowed *Mead* in *Christensen v. Harris County*, 529 U.S. 576 (2000). *Christensen* declined to grant *Chevron* deference to an opinion letter signed by the acting administrator of the Wage and Hour Division of the Department of Labor, holding that "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines—do not warrant *Chevron*-style deference." *Id.* at 587. *Christensen* held that documents issued without the force of law do not receive *Chevron* deference, *see id.*, but the opinion provided little guidance as to when and to what types of agency statements this exception would apply.

expertness, and to the persuasiveness of the agency's position." *Id.* at 228 (citation omitted). *Chevron* applies only if "Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law." *Id.* at 229. Furthermore, even if the agency has the legislative authority to act with the force of law, "the agency interpretation claiming deference [must be] promulgated in the exercise of that authority." *Id.* at 227. The *Mead* Court ultimately found against the Customs Service because "the terms of the congressional delegation give no indication that Congress meant to delegate authority to Customs to issue classification rulings with the force of law." *Id.* at 232-33.

*Mead* explained that "a very good indicator of delegation meriting *Chevron* treatment is express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." 533 U.S. at 229. According to *Mead*, when Congress wants an agency to act with legal force, it wants the agency to guarantee "fairness and deliberation," which the use of a "relatively formal administrative procedure tends to foster." *Id.* at 230. *Mead* also states that notice-and-comment procedures are not the only indicator that Congress intended an agency to act with the force of law, because "other statutory circumstances" may sometimes signal the same legislative objective. *Id.* 229. The Court, however, cited only one case, *NationsBank v. Variable Annuity Life Insurance Co.*, 513 U.S. 251 (1995), in which an agency ruling received *Chevron* deference without notice-and-comment procedures.[2]

---

[2] It is hard to understate *Mead*'s importance. Justice Scalia described the decision as "one of the most significant opinions ever rendered by the Court dealing with the judicial review of administrative action." 533 U.S. at 261 (Scalia, J., dissenting). *Mead* effectively limits *Chevron* to situations in which the agency can show "affirmative legislative intent" that it has lawmaking power. *Id.* at 239 (Scalia, J., dissenting). When Congress intends for the Treasury Department to issue policy statements

---

The majority agrees that *Chevron* does not apply to revenue rulings because such rulings are issued without the force of law.[3] *See also Omohundro v. United States*, 300 F.3d at 1068 ("*Mead* involved a Customs Service tariff ruling, which is closely akin to an IRS revenue ruling. Given that the two types of agency rulings are analogous, we are required to apply *Mead*'s standard of review to an IRS revenue ruling."); *U.S. Freightways Corp.*, 270 F.3d at 1141 (declining to give *Chevron* deference to IRS policy statements made without notice-and-comment formalities); *Am. Express Co. v. United States,* 262 F.3d at 1382-83 (stating that IRS decisions not

---

that have the legal force, Congress clearly so indicates. *See, e.g.,* I.R.C. § 40(f)(3) (authorizing the Secretary to prescribe by regulation the manner in which taxpayers may elect not to have alcohol fuel credits apply); *id.* at § 414(o) (authorizing the Secretary to prescribe regulations necessary to achieve the purposes of the low income housing credit); *id.* at § 42(o) (authorizing the Secretary to prescribe regulations to prevent avoidance of employee benefit provisions). A Treasury Regulation expressly states that revenue rulings "do not have the force and effect of Treasury Department regulations" (which do have legal force). Rev. Proc. 89-14, 1989-1 C.B. 814.

[3] However, the majority tries to minimize this. After writing that, "[i]n light of the Supreme Court's decisions in *Christensen* and *Mead*, we conclude that Revenue Ruling 82-20 should not be accorded *Chevron* deference," the majority notes that "revenue rulings do, however, constitute 'precedent[s] [to be used] in the disposition of other cases.' Rev. Proc. 89-14, 1989-1 C.B. 815. Revenue rulings also serve as 'official interpretation[s]' by the IRS of the tax laws. Treas. Reg. § 601.201(a)(6)." (alterations in majority op.). Yet neither the fact that revenue rulings are "official" or serve as precedent for the IRS to use in other cases gives revenue rulings legal force. *See* Rev. Proc. 89-14, 1989-1 C.B. 814. Under *Mead*, the absence of legal force is the primary indicia of a regulation warranting only *Skidmore* deference, *see Mead*, 533 U.S. at 232-33, and neither the "officiality" of revenue rulings nor the Treasury Department's intent that the IRS use revenue rulings to guide subsequent decisions makes the revenue ruling itself likely to better withstand *Skidmore* scrutiny because neither factor makes the revenue ruling necessarily more thoroughly considered, consistent, valid, or otherwise persuasively reasoned. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1940).

adopted in regulations after notice and comment are probably not entitled to *Chevron* deference). The *Mead* Court noted that agency statements ineligible for *Chevron* deference may still receive *Skidmore* deference. *Mead*, 533 U.S. at 234-35 ("*Chevron* left *Skidmore* intact and applicable where statutory circumstances indicate no intent to delegate general authority to make rules with force of law, or where such authority was not invoked.")

In *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), the Court gave an agency pronouncement only the weight it deserved in light of "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Id*. at 140.

When the majority claims the Tax Court erred by failing to acknowledge that "*some* deference to revenue rulings is proper" (emphasis added), the majority overstates *Skidmore* "deference." *Skidmore* "deference" does not always involve "deferring" because the level of respect afforded the agency pronouncement depends on its "power to persuade." *Skidmore*, 323 U.S. at 140. An agency pronouncement with no persuasive power receives no deference. Therefore, because the Tax Court majority found the Treasury Department's justification for its revenue ruling unpersuasive, the Tax Court did not err by failing to acknowledge that "some deference to revenue rulings is proper." Likewise, to the extent this Court finds the Treasury Department's rationale unpersuasive, we have no obligation to defer. Exactly as the majority explains, "the amount of deference to be accorded to Revenue Ruling 82-20 ultimately turns upon the validity of its reasoning."

The majority cites a string of four cases in support of its statement that even after *Mead* "some deference to revenue rulings is proper." Yet none of these cases push *Skidmore* "deference" to the level that the majority would have in the present case. The first case cited, *Omohundro*, 300 F.3d

1065, grants *Skidmore* "deference." But as explained, *Skidmore* "deference" relies on the "power to persuade." *Omohundro* granted "deference" only after ruling, "First, the IRS's reasoning is valid." *Id.* at 1068. The "deference" accorded was to persuasive reasoning, not merely to IRS interpretive authority. The majority in the present dispute accords deference based upon the Revenue Ruling itself, apart from its persuasive power.

The second case cited, *Del Commercial Props., Inc. v. Comm'r*, 251 F.3d 210, 214 (D.C. Cir. 2001), was released ten days before *Mead*. Given that the majority acknowledges the relevance of *Mead*, it is not clear why this case is cited.

The third case cited by the majority, *U.S. Freightways Corp. v. Comm'r*, 270 F.3d at 1139, states:

> Although we acknowledge that even after *United States v. Mead Corp.*, 533 U.S. 218, 150 L. Ed. 2d 292, 121 S. Ct. 2164 (2001), we owe some deference to the Commissioner's interpretation of his own regulations, we conclude here that the lack of any sound basis behind the Commissioner's interpretation, coupled with a lack of consistency on the Commissioner's own part, compels us to rule in favor of Freightways.

This statement highlights again the importance of *Mead*. While *U.S. Freightways* professes to accord some "deference," it is not at all clear that the term is being used to signify anything substantially beyond than the "power to persuade," under *Skidmore*. After all, as stated in the quoted passage above, *U.S. Freightways* rejected the Commissioner's ruling, which severely calls into question the amount of true deference that was actually given by the Seventh Circuit.

The last case cited by the majority is *Am. Express Co.*, 262 F.3d 1376. This case, unlike *U.S. Freightways*, held in favor of the Commissioner. However, *American Express* is readily distinguishable from the present case. In *American Express*,

the court ruled that the interpretation was not at all in conflict with the applicable regulation, since on its face the regulation simply did not address the issue at hand. *Id.* at 1381 ("There is nothing on the face of IRS Rev. Proc. 71-21 that defines the term 'services,' . . . ."). By contrast, in the present case, the regulation on its face addressed the issue with sufficient clarity to warrant a ruling from the Tax Court, in favor of Taxpayer. Thus, even though *American Express* professed to accord "deference" to the IRS interpretation, the context in that case was such that the amount of actual deference accorded was not nearly as great as that accorded by the majority in the present case.

While the language contained in *Omohundro*, *U.S. Freightways*, and *American Express* does indicate that even after *Mead* some "deference" is due to revenue rulings, it is not at all clear that this deference is anything more than *Skidmore* "deference," which simply mandates that the reviewing court must consider agency interpretations, examining them for their "power to persuade."

The following sections explain why the government's reasoning is invalid.

## II.

Unlike the majority, I see no reason to rely on two equally antiquated decisions from other circuits that deal with ostensibly similar tax controversies.[4] Both *Walt Disney, Inc. v. Comm'r*, 4 F.3d 735 (9th Cir. 1993), and *Salomon, Inc. v. Comm'r*, 976 F.2d 837 (2d Cir. 1992), accepted Petititoner's

---

[4] The majority properly emphasizes that "'[u]niformity among the circuits is especially important in tax cases to ensure equal and certain administration of the tax system.'" (quoting *Nickell v. Comm'r*, 831 F.2d 1265, 1270 (6th Cir. 1987)). This principle does not limit our obligation to react to new Supreme Court decisions. As discussed further below, the majority wrongly relies on *Chevron*-era tax precedents. We cannot ignore *Mead* in the name of consistency.

interpretation in Rev. Rul. 82-20. These cases are distinguishable and outdated.

In both *Disney* and *Salmon*, the taxpayers sought rulings from the IRS as to whether they would qualify for tax-free "D" reorganizations. *Disney*, 4 F.3d at 737; *Salomon*, 976 F.2d at 839. Also in both cases, the taxpayers represented to the IRS that they would recapture ITCs associated with property transferred to newly formed subsidiaries. The IRS then issued private letter rulings stating that the transactions would qualify as tax-free "D" reorganizations. *See* Priv. Ltr. Rul. 8215003 (Oct. 22, 1981) (Disney ruling); Priv. Ltr. Rul. 8132115 (May 18, 1981) (Salomon ruling). Each taxpayer then reorganized its business, but did not recapture the ITCs. *Disney*, 4 F.3d at 736; *Salomon*, 976 F.2d at 838. In the ensuing litigation, Commissioner did not challenge the effectiveness of the reorganizations, *see Disney*, 4 F.3d at 738; *Salomon*, 976 F.2d at 839, but Commissioner never expressly stipulated that the transactions met the requirements of §§ 355 and 368(a)(1)(D). In contrast, Commissioner made that stipulation in this case, which means Commissioner concedes that the split-off was "not used principally as a device for the distribution of the earnings and profits" of LOF or LOF Glass. *See* I.R.C. § 355(a)(1)(B).[5]

---

[5] As the majority notes, the *Salomon* court depended heavily on its conclusion that

[i]n substance, if not in form, the direct and the circuitous transaction are the same. Each achieves a rapid transfer of section 38 property outside the group. To distinguish between them would deny economic reality. Moreover, such a holding would allow the common parent of a consolidated group . . . to move section 38 property outside the group without paying recapture taxes simply by first transferring the property to a member subsidiary and then distributing the subsidiary's stock to the third-party.

976 F.2d at 842. *Disney* then quotes this text. *See* 4 F.3d at 739. We cannot conclude that Respondent intended "to move section 38 property

Even without this distinction, neither *Disney* nor *Salomon* should influence this Court. Both *Disney* and *Salomon* explicitly stated that IRS revenue rulings deserve "great deference." *Disney*, 4 F.3d at 740-41; *Salomon*, 976 F.2d at 841. We cannot know what conclusion the *Salomon* or *Disney* courts would have reached had they not afforded the Commissioner "great deference" revenue rulings unquestionably no longer receive. *See Omohundro v. United States*, 300 F.3d at 1068; *U.S. Freightways Corp.*, 270 F.3d at 1141; *Am. Express Co.*, 262 F.3d at 1382-83. This tremendous difference makes *Disney* and *Salomon* inapplicable in contemporary tax litigation.

## III.

The next step is to consider whether the Commissioner has offered a persuasive position.

## A.

The consolidated return provisions in the tax code allow multiple corporations (including a parent and subsidiaries) to file a single consolidated tax return. I.R.C. §§ 1501, 1504(a)(1). The majority notes this, but fails to recognize how the single taxpayer theory implicates the present controversy.

To file a consolidated return, each subsidiary must be linked, directly or indirectly, to the common parent by an ownership chain of both 80% of the voting power of the subsidiary and 80% of the value of the subsidiary's stock. I.R.C. § 1504(a)(2). Once a group of corporations elects to file a consolidated return, the corporations must remain in the group unless they cease to qualify as group members or the

---

outside the group without paying recapture taxes," *see Salomon*, 976 F.2d at 842, when Commissioner concedes that the split-off was "not used principally as a device for the distribution of the earnings and profits." *See* I.R.C. § 355(a)(1)(B).

Secretary consents to deconsolidation. I.R.C. §§ 1501, 1504; Treas. Reg. 1.1502-75. Congress and the Treasury Department realized that "[i]n substance, there was little distinction between a corporation that chose to conduct its business by means of divisions and another corporation that preferred to operate its various businesses through subsidiaries." CRESTOL, ET AL., THE CONSOLIDATED TAX RETURN ¶ 1.01 at 1-2 (5th ed. 2000). Therefore, consolidated returns allow parents and subsidiaries to be treated as though they were a "single taxpayer." Commissioner concedes that the economic approach underlying the consolidated return regime is the "single taxpayer theory." (Comm'r Br. at 14-16.) As noted, the majority offers no response to this argument.

## B.

Congress delegated authority to the Treasury Department to promulgate regulations governing the distribution of tax credits among the members of a consolidated group. Accordingly, the Secretary of the Treasury instituted § 1.1502-3, which covers the handling of "consolidated tax credits," including the disposition of Section 38 property. *See* Treas. Reg. § 1.1502-3(f). Under section 1.1502-3(f)(2)(i):

a transfer of Section 38 property from one member of the group to another member of such group during a consolidated return year shall not be treated as a disposition or cessation within the meaning of section 47(a)(1). If such Section 38 property is disposed of, or otherwise ceases to be Section 38 property or becomes public utility property with respect to the *transferee*, before the close of the estimated useful life which was taken into account in computing qualified investment, then section 47(a)(1) or (2) shall apply to the *transferee* with respect to such property (determined by taking into account the period of use, qualified investment, other dispositions, etc., of the transferor). Any increase in tax due to the application of section 47(a)(1) or (2) shall be

added to the tax liability of such *transferee* (or the tax liability of a group, if the transferee joins in the filing of a consolidated return).

(emphasis added). Thus, the regulation tests the transferee to determine whether it must recapture ITCs and whether the transferee may report the recapture on its separate return (if it has left the consolidated group) or the consolidated group return (if the transferee remains a member of the group).[6] No other consolidated return regulation addresses ITC recapture and no other regulation explicitly requires ITC recapture when a transferee of Section 38 property is split-off from the affiliated group in a valid "D" reorganization. The majority offers no response to this argument.

## C.

Once § 1.1502-3(f)(2)(i) imposes transferee liability for ITC recapture on consolidated group members, § 1.1502-3(f)(3) provides five illustrations of how § 1.1502-3(f)(2)(i) will apply:

Example (1). P, S, and T file a consolidated return for calendar year 1967. In such year S places in service Section 38 property having an estimated useful life of more than 8 years. In 1968, P, S, and T file a consolidated return and in such year S sells such property to T. Such sale will not cause section 47(a)(1) to apply.

Example (2). Assume the same facts as in example (1), except that P, S, and T filed separate returns for 1967.

---

[6]This is different from the ITC provisions in the I.R.C. § 47(a)(1) and (2). In § 47, while a transfer between non-consolidated group members may constitute a "mere change in form that does not trigger recapture," it is the transferor that the IRS holds liable for the recapture if the transferee disposes of the property or the transferor disposes of its interest in the transferee. The transferee has no liability at all. I.R.C. § 47(b).

The sale from S to T will not cause section 47(a)(1) to apply.

Example (3). Assume the same facts as in example (1), except that P, S, and T continue to file consolidated returns through 1971 and in such year T disposes of the property to individual A. Section 47(a)(1) will apply to the group and any increase in tax shall be added to the tax liability of the group. For the purposes of determining the actual period of use by T, such period shall include S's period of use.

Example (4). Assume the same facts as in example (3), except that T files a separate return in 1971. Again, the actual periods of use by S and T will be combined in applying section 47. If the disposition results in an increase in tax under section 47(a)(1), such additional tax shall be added to the separate tax liability of T.

Example (5). Assume the same facts as in example (1), except that in 1969, P sells all the stock of T to a third party. Such sale will not cause section 47(a)(1) to apply.

When closely scrutinized, these examples vindicate Taxpayer's position.

In example one, P, S, and T are members of a consolidated group at all times. There is no § 47 disposition of the Section 38 property when S obtains it and sells it to T, because T has simply assumed S's role.

In example two, S acquires the property from P before the corporations become members of a consolidated group. S then transfers the property to T after the corporations form a consolidated group. P still did not engage in a § 47 transfer because the entire transaction occurred within a consolidated group.

In example three, the corporations acquire and transfer the Section 38 property while belonging to a consolidated group, but T then transfers the Section 38 property to some unrelated party. This triggers a § 47 ITC recapture for which the consolidated group is responsible.[7]

In example four, when T transfers the Section 38 property to an unrelated third party, P, S, and T are no longer members of a consolidated group. Thus, T files a separate return. T's transfer outside the group triggers the ITC recapture and that "additional tax shall be added to the separate tax liability of T." Treas. Reg. § 1.15.02-3(Ex. 4). The liability is not imposed on S, the transferor of the Section 38 property, or P, the other group member. Transferee liability is imposed on T. This reflects the policy embedded in § 47 and the ITC provisions that the responsible entity (now T) must continue to use Section 38 property its trade or business for the appropriate period.

In example five (like example one), the Section 38 property was acquired by S and transferred to T while all parties remained members of a consolidated group. When P sells T's stock to a third party, no recapture occurs. The rule of transferee liability dictates that there is no ITC recapture because T remains liable for ITC obligations as the transferree of Section 38 property. If T disposes of the property, ceases using it in its trade or business, or joins a new consolidated

---

[7] Commissioner argues that this result occurs because the regulations (and examples) assume that the consolidated group members initially intended for the property to remain within the group. This speculation ignores § 1.1502-3(f)(2), which imposes liability based on whether or not an intra-group transfer took place, not whether or not the parties intended the Section 38 assets to remain in the group after the transfer. Notably, the regulations contemplate that T may leave the group and file its own return or a return with a new consolidated group. *See* Treas. Reg. § 1.1502-3(f)(2)(i).

group, T will be liable.[8] The original transferor has no post-transfer recapture liability.

Example five reflects precisely what happened in this case. A parent (LOF) transferred Section 38 assets to a subsidiary (LOF Glass) that was a member of the parent's consolidated group. The parent then transferred its stock in the subsidiary to a third party outside the consolidated group (Pilkington).[9] According to example five, any liability for recapture lies with the transferee, not with the original parent/transferor.

**D.**

In Rev. Rul. 82-20, 1982-1 C.B. 6, the IRS considered the application of the ITC recapture provisions of the IRC and the consolidated return regulations. Specifically, the IRS applied § 1.1502-3(f) to a corporate reorganization which, as in this case, qualified under §§ 355(a)(1) and 368(a)(1)(D) for nonrecognition treatment. The ruling involved a transfer of assets, including Section 38 property, by a parent corporation to its wholly-owned subsidiary, followed by a distribution of the subsidiary's stock to one of the parent corporation's shareholders. Since the parent and the subsidiary filed a consolidated tax return, the situation addressed in the Revenue Ruling is very similar to that presently before this Court.

The ruling initially noted that under Treas. Reg. § 1.47-3(f)(5)(ii) a recapture determination is required when the transferor of the Section 38 property does not retain a substantial interest in the subsidiary. This is in tension with § 1.1502-3(f)(2)(i), which does not treat the transfer from one

---

[8] If T joins a new consolidated group, then T and the other members of the new consolidated group would then be liable. *See* Treas. Reg. § 1.1502-3(f)(2).

[9] As described above, this transfer occurred in exchange for the third party's (Pilkington's) stock in the parent (LOF).

member of a consolidated group to another as a § 47 disposition. To reconcile these provisions, the Commissioner assumed that the consolidated return regulation, § 1.1502-3(f)(2)(i), was "premised on the assumption that the property [would] remain[] within the consolidated group. When there is no intention at the time of the transfer to keep the property within the consolidated group, the transaction should be viewed as whole and not as separate transactions." Rev. Rul. 82-20.

The rationale, according to the Commissioner, is that a parent corporation's transfer of Section 38 property to its wholly-owned subsidiary is not treated as a disposition so long as the parent corporation substantially owns the subsidiary. I.R.C. § 47(b). When such a transfer is followed by a split-off of the subsidiary's stock, however, recapture is imposed immediately because the transferor no longer retains a "substantial interest" in the transferee. If the government has correctly interpreted § 1.1502(f)(2)(i), then Taxpayer must recapture the ITCs. The majority offers no response to this argument.

### E.

Rev. Rul. 82-20 is inconsistent with § 1.1502(f)(2)(i) because the treasury regulation focuses on making the transferee responsible for the Section 38 property, whereas the Revenue Ruling looks to the "intent" of the parties in the consolidated group. Depending on whether the parties in the consolidated group intended to transfer the Section 38 property to a third party ultimately, either the transferor or the transferee may have to recapture the ITCs.

First, if intent were the decisive factor under the regulation, the regulation would make that clear. Commissioner argues that the regulation does make that clear, because in crucial example five, the parent, subsidiary, and transferee file consolidated returns in 1967 and 1968, and the subsidiary transfers its Section 38 property in 1968, but the parent does

not sell the transferee's stock until 1969. § 1.1502-3(f)(3) (Ex. 5). Commissioner concludes that the parent does not recapture the ITCs in this example only because the parent waited a year before selling the transferee's stock.[10] Since the hypothetical parent waited a year, the consolidated group must not have "intended" to move the assets outside of the group when it transferred them within-group to its subsidiary.

This extraordinarily strained hypothesis is hard to accept primarily because the relevant regulations never mention intent. One cannot reasonably believe that the Treasury Department meant an intent test but, rather than saying so expressly, it said so through the circuitous route Commissioner defends. A parent company could certainly wait a year before transferring assets outside the consolidated group, yet have intended to make the transfer from the outset. Most likely, example five has the relevant events occurring in different years simply to make the hypothetical as simple and clear as possible with respect to the order in which the transactions take place. That certainly seems a more plausible explanation than to assume the reference to a different year somehow implies an intent standard. It also seems reasonable that the Treasury Department merely wanted example five to illustrate the clear language in § 1.1502-3(f)(2), which places obligations on the transferee without discussing the transferor's intent.[11]

---

[10] This example stand in contrast to this case, in which the parent waited only a weekend to make the transfer.

[11] Treas. Reg. § 1.1502-3(f)(2)(i) states:

a transfer of Section 38 property from one member of the group to another member of such group during a consolidated return year shall not be treated as a disposition or cessation within the meaning of section 47(a)(1). If such Section 38 property is disposed of, or otherwise ceases to be Section 38 property or becomes public utility property with respect to the *transferee*, before the close of the estimated useful life which was taken into

Second, the interpretation in Rev. Rul. 82-20 fails to respect the single-taxpayer theory that underlies the consolidated

account in computing qualified investment, then section 47(a)(1) or (2) shall apply to the *transferee* with respect to such property (determined by taking into account the period of use, qualified investment, other dispositions, etc., of the transferor). Any increase in tax due to the application of section 47(a)(1) or (2) shall be added to the tax liability of such *transferee* (or the tax liability of a group, if the transferee joins in the filing of a consolidated return).

(emphasis added).

The majority claims that:

the more persuasive interpretation is that the decision to assign different events to different calendar years in Example 5 of CRR § 1.1502-3(f), rather than merely listing the order of events, has greater significance. *See* 2A Singer, Norman J., *Sutherland Statutes and Statutory Construction*, § 46.06 at 192 (2000 ed.) ("every word of a statute must be presumed to have been used for a purpose").

The majority wants to infer an intent test because example five lists separate calender years, instead of simply the order of events. This argument is silly. Had the Commissioner listed the order of events, rather than calendar years, it would not make an intent test a less plausible inference—a taxpayer *intending* to transfer § 47 assets out of the consolidated group would could still undertake the same series of transactions in the same allegedly nefarious sequence. The reference to "calendar years" as opposed to "the order of events" indicates nothing about whether the Commissioner meant to incorporate an intent test.

The Commissioner's choice of language, however, tells us much more. If the Commissioner wanted an intent test, he could have used the word "intent" in his example. *Sutherland* also supports my interpretation. *See, e.g.*, 2A Norman J. Singer, Sutherland Statutes and Statutory Construction § 46.06 at 135 (2000 ed.) ("What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will."); Singer, *supra*, § 47:23 at 304-06 (explaining that the doctrine of *expressio unius est exclusio alterius* indicates "an inference that all omissions should be understood as exclusions").

return regulations. As already noted, according to I.R.C. § 47(a) (1) and (2), if a transfer between *non*-consolidated group members triggers recapture, the *transferor* is liable for the recapture while the transferee has no liability. I.R.C. § 47(b); Treas. Reg. § 1.47-3(f)(5). The single taxpayer theory, however, involves ignoring transactions between members of a consolidated group. By attempting to impose recapture liability on the transferor, Commissioner would create situations—like this one—where liability would remain with the group even after the subsidiary holding the assets has left. This conflicts with the single-entity approach by treating a now-separate corporation as though it still belonged to the consolidated group.[12] It is significant, therefore, that the Supreme Court attempts to interpret the consolidated return regulations in a manner consistent with the single-entity theory. *See United Dominion Industrs. v. United States*, 532 U.S. 822 (2001) (holding that the single-entity approach is the proper method for calculating product liability losses among a consolidated group).

Due to the single-taxpayer theory embodied in the consolidated return regulations and the resulting transferee liability imposed on LOF Glass for the ITC recapture, LOF's transfer of the Section 38 property to LOF Glass did not trigger § 47; there was no disposition of Section 38 property, and thus no ITC recapture. *See* Treas. Reg. § 1.1502-3(f)(2)(i). Commissioner argues that even if this is the correct

---

[12]Commissioner's position is also inconsistent with the notion that the entity with the ability to keep the Section 38 property in the appropriate trade or business use should be the same entity that faces recapture if it fails to do so. It may be more efficient to have the taxpaying party be the one that holds the assets rather than force the transferor to attempt to guarantee their future use *ex ante* by contract, since the property-holder (transferee) can more easily adapt to changes in its economic circumstances over the relevant life of the Section 38 material. Notably, this case is not about whether a tax gets paid, but who will pay it—the transferee or the transferor. Thus, siding with Taxpayer will not necessarily encourage tax avoidance.

interpretation of § 1.1502-3(f)(2)(i), the initial transaction became relevant for § 47 purposes when LOF Glass left the LOF-affiliated group because the parent (LOF) no longer retained interest in the Section 38 property.

In April of 1986, LOF Glass split-off from the LOF affiliated group in the "D" reorganization with the exchange of LOF Glass shares for Pilkington's interest in LOF. This occurred immediately after LOF made LOF Glass an independent subsidiary, but the parties stipulated that LOF Glass continued to use the Section 38 property in the glass business both before and after LOF Glass left the consolidated group. When LOF Glass left the group, it did so subject to the transferee obligation for the ITC recapture that arose when it received the Section 38 property along with the LOF Glass Division business initially. *See* Treas. Reg. § 1.1502-3(f)(2)(i).

Although Commissioner argues, in accordance with Rev. Rul. 82-20, that these intra-group transfers and the "D" reorganization evince an intent to *avoid* ITC recapture by disposing of the property outside of the group, the worst the transactions show is nothing more than a shift in ITC recapture liability.[13] By transferring the LOF Glass Division and the Section 38 property within the consolidated group, the parties imposed liability for the ITC recapture on LOF Glass. When Pilkington acquired LOF Glass—albeit one day later—LOF Glass brought with it the same ITC recapture obligation. If LOF Glass became a member of a Pilkington consolidated group, then that consolidated group would be subject to ITC recapture as well. *See* Treas. Reg. § 1.1502-3(f)(2)(i). Under the consolidated return regulations, the ITC

---

[13]And it is not necessarily an intentional shift, since Commissioner stipulated that the reorganization was "not used principally as a device for the distribution of the earnings and profits of LOF or LOF Glass." (*See* J.A. at 57.) The Commissioner's stipulation is discussed more thoroughly in conjunction with the step-transaction issue below.

recapture obligations remained, although now assigned to a different party.

## IV.

Commissioner also argues that the interpretation of § 1.1502-3(f)(2)(i) contained in Rev. Rul. 82-20 is consistent with the "step-transaction doctrine." Commissioner notes that the "incidence of taxation depends upon the substance of a transaction," rather than its form. *Comm'r v. Court Holding Co.*, 324 U.S. 331, 334 (1945); *see also Kluener v. Comm'r*, 154 F.3d 630, 634 (6th Cir. 1998). "The step transaction doctrine is a judicial device expressing the familiar principle that in applying the income tax laws, the substance rather than the form of the transaction is controlling." *Brown v. United States*, 782 F.2d 559, 563 (6th Cir. 1986) (internal quotations omitted). Under this doctrine, "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." *Comm'r v. Clark*, 489 U.S. 726, 738 (1989). Although various courts have applied different tests to determine whether the step-transaction doctrine applies in a particular case, this Court uses the "end result" test. *Brown*, 782 F.2d at 564. Pursuant to the "end result" test, "purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." *Id.* (internal quotation marks omitted).

The appeal of step-transaction analysis rapidly dissipates when one remembers that Commissioner stipulated that the transaction appropriately received "D" reorganization treatment, which means Commissioner stipulated, *inter alia*, that the split-off transaction was "not used principally as a device for the distribution of the earnings and profits" of LOF or LOF Glass. *See* I.R.C. § 355(a)(1)(B). The Commissioner thus conceded that LOF and LOF Glass were engaged in the "active conduct of a trade or business" for at least five years

prior to the transaction and for five years after Pilkington became the owner of LOF Glass. *See* I.R.C. § 355(a) and (b). If the transfers from LOF Glass Division to LOF Glass and ultimately to Pilkington had economic viability (and thus were not merely tax avoidance transactions), then the step-transaction doctrine cannot apply. *See* Rev. Rul. 79-250, 1979-2 C.B. 156, 157 (explaining that where each step in a corporate reorganization has an independent legal and economic significance, the step-transaction doctrine does not apply).

The majority cites no authority for the proposition that the IRS can accept an entire transaction as justified by a legitimate business purpose to determine whether "D" reorganization treatment will apply, but *not* accept a part of that same transaction as motivated by a legitimate business purpose exclusively to determine ITC recapture—particularly given that the "substance over form" principle requires courts to view transactions "as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant."[14] *Court Holding*, 324 U.S. at 334.

The majority further concedes, as it must, that this case does not involve a situation where "'[t]he whole undertaking . . . was in fact an elaborate and devious form of conveyance

---

[14] One sentence drafted by the majority deserves particular attention. The majority claims, without citation, that "[h]ere, although the individual steps of the transaction had a legitimate business reason, the transaction must be treated as a single unit and judged by its end result." I have no idea how a party could possibly intend several steps to achieve various legitimate business purposes but simultaneously intend the *series* of steps to accomplish an illegitimate tax-avoidance objective. As a matter of logic, if an agent undertakes a series of related acts, and if each step is viewed as part of a process intended to achieve an legitimate goal, it is impossible to view all steps as intending to serve illegitimate ends. Somewhere along the line, the agent *must* have intended at least one of the steps to accomplish something improper (in this case, without a legitimate business purpose). Commissioner concedes Respondent acted with a business purpose at every stage.

masquerading as a corporate reorganization, *and nothing else.*' *Gregory v. Helvering*, 293 U.S. 465, 470 (1935) (emphasis added)." By emphasizing "and nothing else," the majority implies that, despite the government's stipulation, both a legitimate business purpose and an improper tax avoidance objective motivated the disputed transaction. The majority then cites a Tenth Circuit case, *Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1526 (10th Cir. 1991), for the general proposition that a taxpayer may not dodge provisions of the tax code merely because the taxpayer can articulate some business purpose for its activity. In the present dispute, however, Taxpayer offers this Court much more than a general assurance that it had a business purpose for its transaction.[15]

Again, the Commissioner stipulated that the transaction properly received "D" reorganization treatment, which means Commissioner stipulated, *inter alia*, that the split-off transaction was "not used *principally* as a device for the distribution of the earnings and profits" of LOF or LOF Glass. *See* I.R.C. § 355(a)(1)(B) (emphasis added). The phrase "a device for the distribution of . . . earnings and profits" means simply "a device for the distribution of . . . earnings and profits [so as to avoid taxes]." *Id*. Put differently, the Commissioner conceded that the split-off was not *principally* a tax avoidance mechanism. The majority's Tenth Circuit step-transaction case does not involve any stipulation by Commissioner—let alone a concession that the taxpayer's transaction did not principally serve a tax-avoidance purpose.

Moreover, in Rev. Rul. 79-250, 1979-2 C.B. 156, the Commissioner conceded that in § 368 situations like this one,

---

[15] In fact, the *Associated Grocers* court "share[d] the government's skepticism as to the alleged significance of taxpayer's claimed business purpose." 927 F.3d at 1527. *Associated Grocers* also involved a completely different statutory provision—a liquidation under I.R.C. § 332 rather than a § 368 restructuring. *Id*. at 1519.

the step-transaction doctrine would not apply. According to the Commissioner, "*the substance of each of a series of steps will be recognized and the step transaction doctrine will not apply, if each such step demonstrates independent economic significance, is not subject to attack as a sham, and was undertaken for valid business purposes and not mere avoidance of taxes*." (emphasis added). This seems to resolve the matter, and the majority has no rational reason to defer to Rev. Rul. 82-20 at the expense of Rev. Rul. 79-250.

## V.

More than two decades ago, this Court correctly observed that the Treasury Department's consolidated return regulations should receive greater deference than interpretations of those regulations. *See Wolter Constr. v. Comm'r*, 634 F.2d 1029, 1034-35 (6th Cir. 1980). This principle unquestionably applies here. It seems either very difficult or impossible for an interpretive statement to survive *Skidmore* review when that statement conflicts with the text it purports to interpret. Commissioner's Revenue Ruling is not persuasive because it contradicts the text and examples in § 1.1502-3(f).

For all the aforementioned reasons, I respectfully dissent.